STATE OF CONNECTICUT *v.* PAUL ROMA
(12043)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued December 12, 1985—decision released March 11, 1986

*Lauren M. Weisfeld,* special public defender, for the appellant (defendant).

*Donald A. Browne,* state's attorney, with whom, on the brief, was *Frank S. Maco,* assistant state's attorney, for the appellee (state).

DANNEHY, J. A jury found the defendant guilty of felony murder in violation of General Statutes

§ 53a-54c. He claims on appeal that the trial court erred (1) in allowing the state's key witness, during cross-examination, to invoke his testimonial privilege against self-incrimination, and (2) in failing to give a missing witness instruction. The defendant also claims that he was denied the effective assistance of counsel at trial. We find no error.

The facts of this case may be briefly summarized. The victims, Nicholas and Clotilde Bychowski, owned and operated a coin and gift shop in Bridgeport. On December 18, 1980, they closed their shop at approximately 6 p.m. and drove to their home in Fairfield. When they arrived the Bychowskis were accosted by three men who were armed and masked. The men shot both Nicholas and Clotilde, and stole Clotilde's pocketbook. Clotilde died of her wounds. Nicholas, who wore a bullet proof vest and carried a handgun, was wounded only slightly and, after briefly feigning death, returned fire at the three assailants as they fled from the scene.

The state's principal witness was Paul DiBartolomeo, an accessory and immunized coconspirator in the crime. DiBartolomeo testified that he, the defendant, Tevic Sevri and Michael Fiore had planned the Bychowski robbery in DiBartolomeo's apartment earlier that afternoon. In preparation for the robbery, Sevri had armed himself with a Remington .12 gauge shotgun, and the defendant, a .357 Magnum revolver. As Fiore did not have a weapon of his own, DiBartolomeo contacted a friend, Raul Bourgeois, from whom he borrowed a .22 calibre pistol. He lent this pistol to Fiore for use in the robbery. DiBartolomeo also provided ski masks to Fiore and Sevri. Geraldine Savino, who shared the apartment with DiBartolomeo, gave the defendant a stocking with which to cover his face during the robbery.

DiBartolomeo, Savino, the defendant, Sevri and Fiore then drove in DiBartolomeo's automobile to the Bychowski residence, arriving shortly before the Bychowskis returned home from work. The defendant, Sevri and Fiore got out of the car, taking their weapons and masks with them, after which DiBartolomeo drove to a nearby pre-arranged location where he parked and awaited their return. After approximately ten minutes DiBartolomeo heard a volley of shots being fired from different calibre weapons. Soon thereafter, the defendant, Sevri and Fiore came running back to the car, and related to DiBartolomeo and Savino how they had shot and robbed the Bychowskis. The group returned to DiBartolomeo's apartment where the men sorted through the contents of Clotilde Bychowski's pocketbook. DiBartolomeo later returned to Bourgeois the .22 calibre pistol used by Fiore, and he placed the shotgun used by Sevri and the .357 Magnum used by the defendant into a cardboard box which he sealed and hid.

Approximately nine days later, on December 27, 1980, DiBartolomeo was arrested on unrelated charges, and for personal consideration, discussed more fully below, he agreed to cooperate with the state. DiBartolomeo led police to the cardboard box with the shotgun and the .357 Magnum. With information supplied by DiBartolomeo, the police obtained a search warrant for Bourgeois' home, where they seized the .22 calibre pistol used by Fiore. Subsequent ballistics examinations confirmed that the bullet portions removed from the deceased victim's body had been fired from the .357 Magnum revolver used by the defendant, that two shotgun shells found at the Bychowski residence had been fired from the shotgun used by Sevri, that two flattened buckshot pellets removed from the victim's body were consistent with the type of buckshot fired from the recovered shotgun shells, and that the .22 calibre bullets

recovered from the person of Nicholas Bychowski were fired from the pistol used by Fiore.

I

We first address the defendant's claim that he was denied his sixth amendment right of confrontation when the trial court, on two separate instances during cross-examination, allowed DiBartolomeo to assert his fifth amendment privilege against self-incrimination. Although trial counsel did not properly object and take exception to these rulings, we will consider the defendant's claims under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), because they involve the colorable deprivation of a fundamental constitutional right. *State* v. *Lubesky,* 195 Conn. 475, 481, 488 A.2d 1239 (1985); *State* v. *Wilson,* 188 Conn. 715, 720, 453 A.2d 765 (1982).

DiBartolomeo testified extensively about the events of December 18, 1980, and in exchange for this testimony DiBartolomeo was granted immunity from prosecution for all crimes stemming from his participation in the Bychowski robbery and murder. As part of the agreement, DiBartolomeo was promised a reduced sentence of thirteen and one-half years to life on an unrelated murder conviction. DiBartolomeo's murder conviction, along with several other felony convictions, was admitted into evidence before the jury. It was also brought out on cross-examination that DiBartolomeo had testified for the state in the separate trials of Sevri and Fiore.

The trial court, expressly acknowledging the importance of DiBartolomeo's direct testimony, allowed an extremely wide latitude on cross-examination, and defense counsel took full advantage of it. Defense counsel had at his disposal various statements given by DiBartolomeo to both Bridgeport and Fairfield police, including a tape-recorded interrogation session, as well

as transcripts of prior testimony given by DiBartolomeo at the trials of Sevri and Fiore. Throughout his lengthy and comprehensive cross-examination, defense counsel used these materials to expose numerous omissions and inconsistencies of varying significance in DiBartolomeo's testimony given at the defendant's trial. Defense counsel was allowed to use a tape recorder during cross-examination, and DiBartolomeo frequently was asked to refresh his recollection by listening to his prior recorded statements with regard to matters about which he testified.

As may be expected, some of DiBartolomeo's prior statements to police did not directly relate to the Bychowski incident. Defense counsel nonetheless had access to these statements, and generally was allowed to cross-examine DiBartolomeo about them, even where the inquiry concerned matters of arguable relevance. One such inquiry concerned DiBartolomeo's former "street business" and his possible association with Frank Piccolo, a reputed underworld figure in the Bridgeport area. This matter was pursued briefly in the presence of the jury. When defense counsel asked DiBartolomeo to explain what his "street business" was, DiBartolomeo asserted his fifth amendment privilege against self-incrimination, and the trial court sustained the privilege. The issue which we must decide is whether the defendant was denied his sixth amendment right of confrontation when the trial court sustained DiBartolomeo's refusal to state the nature of his "street business."

"The primary interest secured by the confrontation clause of the sixth amendment is the right to cross-examination. *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); *State* v. *Randolph,* 190 Conn. 576, 591, 462 A.2d 1011 (1983); *State* v. *Wilson,* 188 Conn. 715, 720, 453 A.2d 765 (1982)." *State* v. *Milum,* 197 Conn. 602, 608, 500 A.2d 555 (1985). The

sixth amendment right of a criminal defendant to confront the witnesses against him may at times conflict with the competing fifth amendment right of a witness not to incriminate himself by his answers to questions posed on cross-examination. Where the witness, without asserting the privilege, has already testified, on direct examination, to the incriminating matters sought to be explored on cross, he may be found to have waived his right not to disclose further the relevant details necessary to test the truth or accuracy of what he has already revealed. *Klein* v. *Harris,* 667 F.2d 274, 287–88 (2d Cir. 1981); *State* v. *Altrui,* 188 Conn. 161, 172, 448 A.2d 837 (1982); see *Rogers* v. *United States,* 340 U.S. 367, 71 S. Ct. 438, 95 L. Ed. 344, reh. denied, 341 U.S. 912, 71 S. Ct. 619, 95 L. Ed. 1348 (1951); McCormick, Evidence (3d Ed. 1984) § 140. A witness likewise may not rightfully refuse to answer questions when he is "protected at least against the use of his compelled answers and any evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Garner* v. *United States,* 424 U.S. 648, 653, 96 S. Ct. 1178, 47 L. Ed. 2d 370 (1976); *Kastigar* v. *United States,* 406 U.S. 441, 444, 92 S. Ct. 1653, 32 L. Ed. 2d 212, reh. denied, 408 U.S. 931, 92 S. Ct. 2478, 33 L. Ed. 2d 345 (1972); *State* v. *Biller,* 190 Conn. 594, 600–605, 462 A.2d 987 (1983).

In the present case it cannot seriously be maintained that DiBartolomeo waived the privilege with respect to his possible association with Frank Piccolo, or his "street business," when he testified on direct examination as to the events surrounding the Bychowski crimes. As we have stated, cross-examination into the subject matter of DiBartolomeo's direct testimony was extensive and complete. The matter of DiBartolomeo's "street business" was initiated by defense counsel as he cross-examined DiBartolomeo on the details of his earlier statements given to police. Since DiBartolomeo's

grant of immunity extended only to crimes arising from the Bychowski incident, the trial court properly sustained DiBartolomeo's refusal to testify as to the nature of his "street business."

The fact that the trial court properly sustained DiBartolomeo's fifth amendment privilege concerning his "street business" does not resolve the sixth amendment question, because whether a witness' assertion of his fifth amendment privilege was proper or not makes little ultimate difference to a defendant who has thereby been denied his right of confrontation. "If a defendant's cross-examination is restricted by the competing fifth amendment right of a witness, it may be necessary to strike the direct testimony of that witness." *Dunbar* v. *Harris,* 612 F.2d 690, 692 (2d Cir. 1979); *State* v. *Altrui,* supra, 170. In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. *State* v. *Denby,* 198 Conn. 23, 32–33, 501 A.2d 1206 (1985); *State* v. *George,* 194 Conn. 361, 365–66, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985); *State* v. *Asherman,* 193 Conn. 695, 721, 478 A.2d 227, cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1984). The denial of all meaningful cross-examination into a legitimate area of inquiry fails to comport with constitutional standards under the confrontation clause. *State* v. *Ortiz,* 198 Conn. 220, 226, 502 A.2d 400 (1985); *State* v. *Milum,* supra, 609.

The purpose of the inquiry into DiBartolomeo's "street business" was to impeach his credibility by evidence of specific instances of misconduct. Such inquiry is permissible during cross-examination when the par-

ticular acts of misconduct indicate lack of veracity. "It does not follow, however, that if the acts inquired about are indicative of a lack of veracity, the court must permit the cross-examination. Whether to permit it lies largely within the court's discretion." *Vogel* v. *Sylvester,* 148 Conn. 666, 676, 174 A.2d 122 (1961); *Shailer* v. *Bullock,* 78 Conn. 65, 70, 61 A. 65 (1905); *State* v. *Ferguson,* 71 Conn. 227, 232, 41 A. 769 (1898). DiBartolomeo's "street business" was collateral to the subjects of his direct testimony, and whatever its relevance to his credibility as a witness, the issue of credibility was adequately covered by the introduction into evidence of DiBartolomeo's lengthy felony record, which included a recent conviction for murder. In the presence of the jury, DiBartolomeo admitted that initially he had denied his own involvement in the Bychowski incident, and had falsely implicated certain named individuals other than the defendant, Fiore and Sevri. He also admitted that his testimony was given in exchange for a reduced sentence on a murder conviction. The defendant does not claim on appeal that his cross-examination of DiBartolomeo was other than complete and unrestricted insofar as it concerned the details of the Bychowski robbery and murder, DiBartolomeo's prior statements and testimony, and DiBartolomeo's potential motives to commit perjury. "The extreme sanction of striking the testimony of a witness should be resorted to only where the invocation of the privilege blocks inquiry into matters directly relating to the crime charged and not those which are merely collateral, such as the subjects of the cross-examination for credibility in this case." *State* v. *Valeriano,* 191 Conn. 659, 666–67, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984); *United States* v. *Seifert,* 648 F.2d 557, 561 (9th Cir. 1980); McCormick, supra, § 19 n.14. "Where the privilege has been invoked as to purely collateral matters,

there is little danger of prejudice to the defendant and, therefore, the witness' testimony may be used against him." *United States* v. *Cardillo,* 316 F.2d 606, 611 (2d Cir.), cert. denied, 375 U.S. 822, 84 S. Ct. 60, 11 L. Ed. 2d 55 (1963); see, generally, *Dunbar* v. *Harris,* supra, and cases cited therein. We find that the defendant was not denied his sixth amendment right of confrontation by DiBartolomeo's refusal to divulge the nature of his street business.

The defendant also claims that he was denied his right of confrontation in connection with a second instance where DiBartolomeo was allowed to claim his fifth amendment privilege while testifying. We address this claim only briefly because what we have said thus far applies with even greater force to the following circumstances. After the state had rested its case, the defendant called Gary White, then an inmate at the Massachusetts state prison in Walpole, as a witness. White first met DiBartolomeo in the late summer of 1981 while they were both confined inside the Montville correctional center. According to White, it was common knowledge within the correctional center that DiBartolomeo was confined on suspicion of having committed two murders in the Bridgeport area. White testified that DiBartolomeo had told him that he intended to arrange a deal with the prosecutor by falsely implicating unnamed individuals—referred to as "punks" by DiBartolomeo—in the crimes with which DiBartolomeo was charged.

The state then called DiBartolomeo back to the stand in rebuttal. DiBartolomeo denied making the statements testified to by White, and claimed that he would not have discussed his cases with White under any circumstances because White was known among the inmates in the Montville jail as a paid police informant. DiBartolomeo testified that he and White, while confined, had been in direct competition with each other

in supplying drugs to the inmates at the correctional center, and that whatever White "was capable of doing . . . I was able to do better." On cross-examination, defense counsel sought to explore the details of DiBartolomeo's involvement in drug trafficking within the correctional center. DiBartolomeo admitted his involvement generally, but claimed the fifth amendment privilege with respect to the specifics.

By this time, the focus of the trial had taken a radical turn from the events of December 18, 1980. White had been called to show bias and improper motivation on the part of DiBartolomeo, and DiBartolomeo had been recalled to the stand to show bias and improper motivation on the part of White. The result was a rather extensive testimonial vignette on the inner workings and social conditions at the Montville correctional center. These matters were highly collateral to the crimes with which the defendant was charged.[1] The trial court evidently believed that this testimony was necessary to test the credibility of the state's key witness, a matter within the court's discretion. The trial court did not abuse this discretion by curtailing further inquiry into the details of DiBartolomeo's narcotics activities in the Montville correctional center, and the defendant was not denied his sixth amendment right of confrontation.

## II

We next address the defendant's claim that the trial court erroneously refused to instruct the jury to draw a negative inference from the state's failure to call

---

[1] DiBartolomeo testified that the main reason White had testified was that there was an "open contract" on White's life because he had acted as a police informant and had testified for the prosecution against "a numerous amount of people." The only way to remove the contract, according to DiBartolomeo, was for White to redeem himself by testifying against the state. DiBartolomeo stated that there was a contract on his life as well, due to his testimony in the present matter. He explained that once an inmate earns a reputation as a "snitch," that reputation follows him from one institution to another.

Fiore as a witness. *State* v. *Williams,* 195 Conn. 1, 14, 485 A.2d 570 (1985); *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). To be entitled to such an instruction the defendant was required to show both that Fiore was available and that he was a witness whom the state would naturally have produced. *State* v. *Hart,* 198 Conn. 424, 428, 503 A.2d 588 (1986); *State* v. *Alfonso,* 195 Conn. 624, 631, 490 A.2d 75 (1985).

Fiore and Sevri were tried separately prior to the commencement of the defendant's trial. Fiore, in the middle of his own trial, pleaded guilty to felony murder and was promised a reduced sentence in exchange for his testimony against Sevri and the defendant. Fiore fulfilled his bargain in part by testifying for the state at Sevri's trial. Sevri was nonetheless acquitted by the jury. In the instant matter Fiore, before being called as a witness, informed the state and the defendant that he was recanting his previous version of the incident and his previous testimony under oath, and would no longer implicate the defendant as one of the participants in the Bychowski robbery. In separate interviews with both the state's attorney and defense counsel, Fiore clearly stated his position. Thereafter, neither party called him as a witness.

Under these circumstances, we do not believe that Fiore was a witness the state would naturally be expected to call. If the state had called Fiore to the stand, merely for the purpose of impeaching him with his prior testimony given at Sevri's trial, the defendant could now be arguing that the state had improperly impeached its own witness. *State* v. *Mitchell,* 169 Conn. 161, 164–65, 362 A.2d 808 (1975). It is neither natural nor logical to expect the state to call a witness who has expressed a clear intention not to testify in its favor. The trial court properly refused the defendant's request for an adverse inference instruction on the basis of the state's failure to call Fiore as a witness.

## III

The defendant also claims that he was denied effective assistance of counsel at trial. He acknowledges that his claim of ineffective assistance "is more properly pursued on a motion for a new trial or on a petition for a writ of habeas corpus rather than on direct appeal"; *State* v. *Lubesky,* 195 Conn. 475, 485, 488 A.2d 1239 (1985); but brings this claim now to "protect against the charge of deliberate bypass of the appeal process." The defendant is so protected and may pursue his claim of ineffective assistance of counsel in the proper forum. See *State* v. *Leecan,* 198 Conn. 517, 541–42, 504 A.2d 480 (1986). On the record before us there is no error.

There is no error.

In this opinion the other judges concurred.